**MOORE v. DALLAS POST CARD CO.**

No. 13942.

Court of Civil Appeals of Texas. Dallas.

Oct. 22, 1948.

Rehearing Denied Nov. 26, 1948.

John N. Touchstone and Geo. C. Cochran, both of Dallas, for appellant.

Solon Goode, of Dallas, for appellee.

BOND, Chief Justice.

The parties will be designated as in the court below. Plaintiff Dallas Post Card Company, a corporation, instituted this suit against defendant Le Roy Moore for damages resulting from having been misled by fraudulent concealment and representations by defendant in purchasing a sizeable quantity of worthless and dangerous electric fuse plugs as a part of the articles of merchandise involved in sale of a whole-

sale post card business, good will, and name "Dallas Post Card Company." At the time of the transaction from which this suit arose, plaintiff was in contemplation of attaining a legal existence by incorporation, using the above as the corporate name of the corporation and the merchandise purchased as its corporate assets. J. Hugh Campbell and James A. Gatewood were the contracting parties with whom the defendant consummated the sale and were the incorporators of plaintiff corporation.

In May or June 1946, the defendant and J. Hugh Campbell had some conversations with reference to the sale of defendant's post card business, but at that time the defendant was not interested in a sale. Then on August 1, 1946, the parties began further negotiations, resulting in a written executory agreement in which the defendant agreed to sell and J. Hugh Campbell and James A. Gatewood agreed to buy the stock of merchandise, consisting principally of post cards, portraying scenes in various towns and cities of North and East Texas, —particularly Dallas, Mineral Wells, Longview, McKinney and other nearby towns and cities—and other somewhat similar display items; greeting cards, Christmas cards, souvenir pennants, pillow tops, car stickers and the like; and the defendant's good will and trade name, "Dallas Post Card Company." A physical inventory was to be taken of all merchandise involved in the contract of sale, items to be priced at cost f. o. b. Dallas, Texas, to which was to be added 10% for good will, less 5% to cover any obsolete merchandise that might be in the stock. The sum of $500 was then paid by the plaintiff to defendant as the initial payment for the property, the balance in cash to be paid upon completion and delivery of the inventory and formal bill of sale. The defendant-seller agreed to continue warehousing the merchandise until the purchasers were ready to move it to their own location on Akard Street. On August 24, 1946 the purchasers acknowledged in writing receipt of the inventory taken by the defendant on August 15 of the stock of merchandise, which included 16,300 electric fuse plugs. Then, on August 26, Mr. Campbell in letter to the defendant further acknowledged the physical posses-

sion of the items listed and their removal and storage at his place of business; but, in doing so, expressly disclaimed for himself and the plaintiff corporation the ownership of said property,—only holding same as agent of the seller and in trust for him until the full purchase price was paid and the transaction finally closed. On September 4, 1946 Mr. Campbell, for the plaintiff corporation, made and delivered to defendant Moore its check for the sum of $17,-062.24, reciting thereon "Balance in full purchase price Post Card stock," (signed) "Dallas Post Card Co. J. Hugh Campbell", which sum in regular course of banking business passed to the defendant. The formal bill of sale to the plaintiff, as per the contract, is not in the record but we may reasonably assume that defendant carried out the contract in furnishing it. The plaintiff offered evidence detailing facts and circumstances upon which the trial court, without aid of a jury, based its judgment supporting plaintiff's claim that, in the sale of the post card business, the defendant perpetrated upon the plaintiff actionable fraudulent concealment and representations as to the 16,300 electric fuse plugs which resulted in its damage to the extent of the price paid therefor; and equitably decreed that the plaintiff shall tender and deliver to the defendant the aforesaid fuse plugs; whereupon plaintiff may have its execution.

It is our opinion that when the evidence is viewed in its most favorable light to the plaintiff, disregarding all evidence to the contrary and all in conflict, we must, if there is sufficient probative evidence to support the action of the trial court, affirm its judgment. Appellate courts are not authorized to reverse findings supporting judgments of trial courts and substitute their opinions for those of the trier of facts. Hence, summarizing the evidence on the issues properly presented in this appeal, we are of the opinion: (1) That the plaintiff corporation is the contractual injured party; (2) that there was such material concealment and misrepresentation on the part of the defendant as was calculated to and did mislead the purchasers of the involved fuse plugs—their quality and salability, their dangerous instrumentality

401

for safety to life and property unknown to the purchasers but known to the seller, supporting actionable fraud; (3) that the sale of the fuse plugs was such an independent and divisible transaction as to authorize the suit for damages growing out of the fraudulent concealment and representations in reference thereto, which did not require of the purchaser a rescission of the entire sales transaction; (4) that the trial court did not err in admitting in evidence the ordinances of the City of Dallas and the oral testimony relating to the inadvisability of selling such electrical appliances, and (5) that the trial court did not err in refusing defendant to file a trial amendment to raise a new issue that the charter of the plaintiff had been forfeited for nonpayment of franchise tax; hence it was not eligible to maintain this suit. All of the aforesaid issues are properly raised in evidence and presented in appellant's several points of error.

The record does not disclose the exact date of plaintiff's incorporation. It does, however, disclose that at the time the contract of sale was made (August 1, 1946) Campbell and Gatewood contemplated incorporation of the business in name "Dallas Post Card Company." Mr. Campbell testified that the defendant knew of such contemplation when he sold the property to them. Then on August 26, in the letter from Mr. Campbell to Mr. Moore, it will be observed that Dallas Post Card Company, designating itself as a corporation, disclaimed title to the property because of some unforeseen delay in closing the deal. This, we think, evidences its corporate existence as having occurred sometime between August 1 and August 26. Furthermore, on September 4, the corporation paid Mr. Moore for the property, earmarking its check that it was for the "Balance due for the post card stock." We think a reasonable inference from above disclosure is that Campbell and Gatewood were acting for and on behalf of the contemplated corporation in reference to the involved transactions.

 The general rules in the law of contracts govern questions as to the capacity of any person to act for a corporation or contemplated corporation in matters within legal corporate powers: "Under the rule that one may sue upon a contract made for his benefit, a corporation may sue to enforce or recover damages for breach of a preorganization contract. And it would seem that the act of suing upon the contract is of itself an adoption of the contract, precluding any objection that the corporation may not sue upon it. What has been done by the promoters in furtherance of the transaction inures for the benefit of the corporation when formed." 10 Tex.Jur., p. 607, sec. 16. So, "To entitle a third person to sue on a contract, it must have been made for his benefit as its object, and he must be the party intended to be benefited. It is not necessary that he be named in the contract, however, nor even that the particular person to be benefited be known when the contract was made; it is sufficient if a third person be in some measure pointed out and designated as the one intended. The person for whose benefit the contract is made must accept it. But a formal acceptance is not necessary; demanding payment * * * or bringing suit upon the contract is a sufficient acceptance." 10 Tex.Jur., p. 483, sec. 280. So in the suit at bar plaintiff alleged, in effect, pertinent here, that Campbell and Gatewood in the transactions with the defendant were acting for and on behalf of the corporation before and after its incorporation; that Mr. Campbell was its agent, president and manager, fully cognizant of its business and authorized to act in all such instances for it. Such evidential disclosures, we think, justified the corporation to maintain this suit. Appellant's relevant points of error are overruled.

The inclusion of the 16,300 electric fuse plugs in the sale of the wholesale post card business is the basis of this suit; and from such inclusion of fuse plugs plaintiff sustained its alleged damage. There is pertinent evidence in the record, on which the trial court manifestly acted, that the fuse plugs were worthless and dangerous electrical instruments, not authorized to be sold or used within the City of Dallas, or sold to the public. In 1936 the defendant purchased 20,000 electric fuse plugs, known in the record as Perma-fuse plugs, from a

manufacturing concern located in Louisville, Kentucky, and acquired the wholesale distributing agency to sell the plugs within Texas and elsewhere. During that year (1936) the defendant sold some of the plugs within his sales territory; and about sixty days after acquiring such agency and the delivery to him of the 20,000 plugs, he put the remaining 16,300 in storage warehouse where they remained seven or eight years, until January 1, 1944. In 1944 the defendant was operating a retail variety store located on Junius Street in the City of Dallas, and during that year he purchased from one Golman the Dallas Post Card business consisting strictly of scenic post cards. At the rear of the building housing his variety store, in a separate apartment, he put his wholesale post card jobbing business with its stock of merchandise, including the fuse plugs. Some few of the plugs he exhibited for sale in his retail variety store. In October 1946, after the executory contract of October 1st had been executed and the $500 advance payment had been made, the defendant furnished to Mr. Campbell the inventory of his stock of merchandise housed in the rear apartment of his building, including the fuse plugs. Mr. Campbell, upon inspection of the inventory and finding that it contained a listing of 16,300 fuse plugs, protested that they were not proper articles of merchandise incident to the wholesale post card business which he had contracted to purchase; but the defendant insisted upon their inclusion, under the duress of refusing to conclude the trade for the post card business unless the plugs were accepted in the deal. Mr. Moore said that "he wouldn't sell the business, it being a going concern, unless the Permafuses were included in it"—representing to Mr. Campbell that the fuses were good saleable merchandise; that he had a good sale on them; and that if he (Campbell) got the post card jobbing business he must take the entire stock, including the Permafuse plugs.

It is admitted in evidence that since 1937 the Perma-fuse Corporation in Kentucky has been in bankruptcy, and that such fuses were no longer manufactured. Defendant Moore testified that at the time he sold the stock to Mr. Campbell and his association

he didn't tell him anything about the corporation being a bankrupt, assigning as reasons why he did not tell him, that it was not relevant, that he had no control over his source of supply, and that Mr. Campbell did not ask him for the facts. The record further discloses that some six months prior to the sale transactions the City of Dallas had adopted an "Electrical Code" which prohibited the sale of electric appliances which had not been approved by the Chief Electrical Inspector of said City. And as to conversation with the defendant, Mr. Campbell testified:

"Q What did defendant say about those fuses on that occasion? A He said he knew they were not approved by the City but that he had been selling them and I could go ahead and sell them. There was no reason for not selling them"; taking the position that the cited ordinances of the City of Dallas were not binding upon him because such restrictive ordinances were void and unconstitutional.

A Mr. Darrow, Chief Electrical Inspector of the City of Dallas, a graduate electrical engineer of about twenty years experience, and who had been holding his position with the City for about three and one-half years, testified:

"Q Mr. Darrow: I show you an electrical fuse plug bearing the imprint "Perma-fuse" and will ask if you are familiar with the operation of that fuse plug when installed in an electric circuit? A Yes sir, I am. * * * There is supposed to be mercury in the back chamber. As the fuse overheats, due to overload, the mercury expands and goes into the outer chamber. The fuse is then taken out and rapped sharply on the back end and the mercury flows in through a small hole back in the rear chamber, making contact and renews the circuit and renews the fuse. * * *

"Q Do you know of your own knowledge whether or not this Perma-fuse plug, which I have exhibited there to you, has ever been approved at any time during your term of office or since, or during the months of September or August of 1946, or since that time has it ever been approved by your office? * * * A It has not.

"Q Mr. Darrow, according to your testimony, you have been Chief Electrical Inspector ever since and before the adoption of the present Electrical Code of the City of Dallas? A Yes, sir.

"Q Mr. Darrow, Section 902, Chapter 9, of the Dallas Electrical Code (code offered in evidence) directs you to approve for sale such electrical equipment, material, conductors and apparatus and appliances as are reasonably safe to persons and property. I will ask you if these Perma-fuse plugs are, in your opinion, reasonably safe to persons and property? A This fuse is not a safe fuse."

Mr. Darrow further testified that he had tested one of such fuses and that "It didn't blow out; it didn't even work." And that "These fuses are unsafe"; that he had investigated them through the International Association of Electrical Inspectors and the Underwriters Laboratories and that said fuses, in their construction, violated sound engineering principles. Plaintiff offered and exhibited in evidence the carton which incased the fuse plugs; it bore the following printed inscription: "The Fuse That Lasts Forever." "Made in U.S.A. The Perma-fuse is revolutionary because it is renewable through an ingenious patented method of retaining mercury in a fuseable carrier. Its advantage to every user is economy, safety, and convenience. Can be used over and over again wherever standard fuse is required. Your first cost is your last cost. These fuses have glass caps for your convenience in locating blown fuse. When ball fuse is located in upper chambre remove fuse from box and tap firmly down for reuse. Guarantee: Each fuse herein has been tested and is guaranteed to be renewable and dependable."

The record discloses that the defendant offered no evidence contradicting the testimony of Mr. Darrow, or evidence to the contrary, or in conflict therewith; thus the fuse plugs are conclusively characterized as dangerous electrical appliances—hence worthless objects of commerce with no intrinsic value.

In Schoefield Gear & Pulley Co. v. Schoefield, 71 Conn. 1, 40 A. 1046, Syl. 10, where prospective seller expressed opinion as to saleability of a machine, the Supreme Court of Errors of Connecticut held:

"Where a prospective seller of a patented improvement in a machine represented to an intending purchaser that it had been largely sold, and was in successful operation and practical use in many mills, and that there was a large demand for it, and that he found it a profitable business, matters of opinion were so blended with statements of the facts from which they arose that they also became statements of fact."

We think the evidence justifies the findings of the trial court in support of its judgment, that the quantity of ancient, obsolete electrical fuse plugs—not approved for sale by authorities of the City of Dallas, dangerous electrical units to life and property, having been purchased and placed in storage, not exposed to sale for more than nine years, and that, too, at a time, known to all men, of the scarcity of electrical appliances—that a legal duty was imposed upon the seller to reveal such facts to the purchasers. The defendant owed plaintiff the duty to reveal all the facts within his knowledge which combined to make these fuses worthless to the buyer. Such vital and essential facts, evidently known to the defendant, would certainly have prevented the consummation of the executory contract if they had been brought to the knowledge of the purchasers, or to any person of normal intelligence. Especially so, when the seller made specific representations that the fuse plugs were good saleable merchandise and that he had good sales on them. The defendant, in possession of plaintiff's $500 earnest money as part of the purchase price for the post card jobbing business, its incidental merchandise, defendant's good will and trade name, waiving conscience as a guide, threatened not to consummate the deal, and by such means succeeded in inducing the plaintiff to purchase the fuse plugs along with the post card business. The sale of such fuse plugs—sensitive safety-valves designed to break electric circuits in case of overload, or when "short circuits" develop, to prevent fires and injury to human lives—we think, to sell such fuses

invites damage liability endangering entire communities.

■ In such cases as here presented, a review of Texas cases reveals that our courts adhere to the position wherein simple good conscience is the guide and rule. Plaintiff in this suit asks no more of his friend and fellow churchman of many years duration than the price he paid for the unsaleable fuse plugs which, in good conscience, no man should dare sell. The trial court's judgment sustains the finding of actionable fraudulent concealment and representations inducing the sale of the fuse plugs. And, from the revealed facts as hereinabove related, such fraud was such an independent and divisible transaction that a rescission of the entire sale was not essential for the plaintiff's recovery of its damage incident to the sale by fraudulent means of the unsaleable articles; and the introduction of the City ordinances evidencing their unsaleability within the city limits of Dallas was not error; we overrule appellant's relevant points of error.

■ During the trial defendant sought leave of the court to file a trial amendment bringing in a belated issue that plaintiff's corporate existence had been forfeited by Texas Secretary of State, hence it was not eligible to maintain its suit. As a basis for his motion, the defendant presented to the court photostatic copy of the Secretary of State's record depicting entry that Dallas Post Card Company, Dallas, Texas, "Right to do business forfeited July 2, 1947." The court took time off to hear evidence on the motion which showed that defendant had been in possession of the photostatic copy of such record since about December 8, 1946, long before announcing ready for trial; and that no notice had ever been brought to the corporate officials that the corporation had failed to pay its franchise tax, and knew nothing of such forfeiture, hence the filing of the trial amendment and the introduction of the photostatic copy of, the record would work a surprise, too late to be available to abate plaintiff's suit. We think there was no abuse of discretion of the trial court in refusing defendant to raise the issue, which is always an inherent attribute of trial courts in refusing belated motions and proffer evidence raising issues of which the movant knew before announcing ready for trial. Appellant's tenth and eleventh points of error relevant to the issue are overruled.

We have carefully reviewed all assignments raised by appellant, and finding no reversible error, the judgment of the trial court is affirmed.